We're going to go ahead and take another case before our break. 22-6170 Harvest Group v. Love's Travel Stops Mr. D'Amelio, did I get that right? Mr. D'Amelio. Yes, D'Amelio. Whenever you're ready. Good afternoon, Your Honors, and may it please this Court, I'm Gerard D'Amelio for Appellant Harvest Group, LLC. Indeed, I'll aim to reserve two minutes for rebuttal. The District Court's judgment in favor of Love's should be reversed because it violates bedrock summary judgment principles. The Court held Harvest was not entitled to any compensation for the work it did to obtain property tax reductions Love's has indisputably used and enjoyed. But it reached that holding by misreading and rewriting the party's agreement and by improperly crediting one piece of testimonial evidence proffered by Love's that failed to address all material facts and was contradicted by evidence proffered by Harvest, the non-movement. It is fundamental that at summary judgment a court cannot weigh evidence, make credibility determinations, or resolve material fact disputes. Because the Court's judgment runs afoul of these tenets, this Court should reverse and revenge. You're talking about the tax assessor's affidavit, is that right? I am, Your Honor. That's an awfully big piece of evidence. And it's not as though she is appearing on behalf of a party. She is offering testimony about her job in Nebraska law and how it works. And she doesn't, she's not there for a party. And she seems to be more than just a witness that is going to be considered during summary judgment. Instead, she's the authority on the subject. So get me over that hump. It seems like she's an awfully important witness and why can't the district court rely on her? Sure. There are several predicaments with sort of relying on that declaration. Let me just kind of respond to the characterization of the testimony. She is a fact witness. I'm not sure I would call her disinterested, but I understand she's not formally affiliated with a party. So I want to start sort of with some things that are actually undisputed on this record and then move directly to kind of what she says and how that interacts with Harvis evidence. So as I think the district court's order shows, this is the only evidentiary basis for the district court's ruling vis-a-vis the property tax reductions. What none of the evidence, what none of Love's evidence or the district court does not address is one half of Harvis' strategy to reduce these property taxes. So the record shows that Harvis had a novel two-part strategy. It would, on the front end, meet with the assessor and other county officials and it would try to reduce the taxable value of the project and then also try to sort of shift the projected valuation that Love's had, that we were required to rely on, so that more of the property was classified as personal rather than real. Now, the assessor's declaration responds to the classification problem, but there is no evidence in the record from Love's and the district court just did not engage with this issue at all, addressing the reduction in the valuation of the property, of the project. By contrast, there's considerable amount of evidence that Harvis put into the record that shows that it did reduce the valuation and this was independently a great victory for the project and reduced Love's taxes by a considerable amount. So Mr. Bowen testifies in his declaration about this reduction of the valuation. Mr. Kreitz, which was Love's former employee, who oversaw the project for Love's, also testified about this in his declaration. Mr. Bowen memorialized the results of this meeting in his contemporaneous emails he sent to Love's. Immediately following the cost segregation meeting, Love's responded in the emails by celebrating. The spreadsheet prepared by Harvis and adopted by the assessor also reflects this valuation shift. That's undisputed and unrebutted on the summary judgment record. Love's does not make any argument. It didn't in the district court or in its answer brief on appeal regarding the lowered valuation of the project. Well, I thought it said all the stuff that happened with the assessor had nothing to do with incentives. The contract talks about incentives, that Harvis Group is an expert in identifying and getting incentives. And is there any evidence that the assessor did anything but simply apply the existing law to the facts as presented? And I'm not saying that Harvis Group didn't do a great thing for Love's in getting a lot of this property changed from real property to personal property, and thereby reducing the tax and also getting the value of the property or the improvements to the property, I guess, reduced. But where's the incentive? And what I thought the assessor was saying, I didn't do anything but apply the law. And maybe the assessor had no authority to grant incentives. Usually that's done by city council or something like that. So respond to that. Certainly, Judge Hartz. There's kind of two points there. And so I'd like to, they're interrelated, but I'd like to address them both. There's kind of the argument around incentives, which centers on this contractual term. And then there's kind of a follow-up to Judge Phillips' question, which is in regard to what the assessor actually testifies to, and kind of what the dispute was over in the district court, which is on classifications, not evaluation. So I want to start with the incentives, and I want to start with the agreement. So Harvis was hired to create and carry out economic development strategies. That included obtaining incentives. Now, incentives and benefits aren't formally defined. They're rather sort of illustrated through this non-exhaustive, open-ended list in the contract. Within that list, property tax reductions is the term used. That qualifies. Then there's also a catch-all term called other various federal, state, and local incentives. So the open-ended nature of all that is further confirmed because the contract says that all projects are unique, and they may require more or fewer services than what's enumerated. So our payment is for the services, and it's pegged to the net present value of incentives that we get. And we could include anything, or we could get a fee for anything subject to two conditions. It must be approved by Loves for Harvis to pursue it, and then it also must be included in the incentives presentation binary. So we submit that the record evidence shows that all of that occurred vis-a-vis the property tax reductions.  Yes, so our position is that under the plain language of the agreement, the property tax reduction that resulted from this meeting was an incentive. That strikes me as a strange construction of the term incentive. Incentive is something you negotiate for, something in return for bringing this big business to the community, but not making arguments about what the facts are that when the standard law is applied reduces your tax burden. Sure. Explain that. Sure. Well, I'll just start by noting again, property tax reductions itself is the term used in the contract. But let me sort of turn to kind of the evidence in the record and this declaration, because I understand that that's really where the dispute is. So talking about the evidence, even if we're required to show we changed Loves' tax burden, which is essentially how the district court read the agreement, the evidence shows that Harvis did that. At worst for Harvis, there are material fact disputes that preclude summary judgment in Loves' favor. So as I noted, the record shows Harvis' efforts lowered the valuation of the project, and it therefore lowered their tax bill. There's simply no contrary evidence to the testimony of Mr. Kreitz in his declaration and Mr. Bowen in his declaration. As to the assessor's declaration, that's the entire evidentiary foundation for the order. There are myriad issues and facts the assessor does not address at all, and those are also unrebutted since there's no counter to the evidence. Do we know what went on in this meeting with the assessor? Excuse me? Do we know what went on in the meeting with the assessor? Can that be described? Apparently the person handling this on behalf of Loves approved meeting with the assessor, was pleased with the result. What happened at the meeting? Do we know? Does the record show anything about what was discussed and what arguments prevailed? Yes, I would certainly agree that the record shows testimony about what occurred. I think Loves is going to say it's disputed, but I don't think it's anything more than disputed at worst for Harvest. So Harvest came forward with this strategy. It was raised to them by Loves and CFO. What does strategy mean? The sort of strategy to reduce their property tax burden. Loves had internal projections that Harvest was required to rely on that showed that Loves anticipated it was going to pay on a 94-6 percentage split on its property classifications and that the valuation would be $298 million. I'll just note, too, the record also shows that the normal course for Loves was to just submit their own internal projections and pay their tax bill upon that, and there's no evidence countering the fact that, but for Harvest's strategy here, that wouldn't have been the reality they were living with. So Harvest comes forward and posits this strategy. It says we have a two-pronged strategy. It's valuation and classification. It brings it to Mr. Haynes on a phone call on September 19th. Loves directs them to take the meeting. They enthusiastically approve that plan. Mr. Kreitz's declaration states that Mr. Haynes on the phone said, essentially, normally I would just pay it and then challenge it later, but I like the strategy more, so go do it. There were some emails in the record, too, in the days beforehand seeming to indicate that Loves believed they could negotiate a lower valuation at the very least. Then we have the meeting on September 20th. Now Mr. Bowen testifies in his declaration. He's one of Harvest's two principals and co-founders. Essentially that they go into the meeting. It's the mayor of Hastings, Nebraska, their economic development director, their city attorney, Ms. Russell, and then his partner, Rudy Watkins. And the meeting goes essentially that they come forward with these internal projections. They want to have a discussion with the assessor. They want to explain basically, you know, they want to sort of dialogue with her about them. They want to explain why they think certain things should be shifted into a more favorable categorization and, on the valuation point, why costs should be excised from any kind of assessment altogether. So Mr. Bowen's testimony is essentially that they're educating the assessor and Hastings. And additionally, kind of on your question, Judge Hartz, there's testimony also in the record from, among other things, Harvest's declarant, that Loves enjoyed a great deal of leverage at this point. Loves was genuinely concerned about the property tax burden it was going to face. And so Mr. Bowen and Mr. Watkins brought that concern to the assessor in the city of Hastings and said, look, our internal projections are showing X tax assessment, and we're really concerned about this. So can we talk to you about this? They talked. Mr. Bowen kept a contemporaneous spreadsheet the entire meeting of basically everything that was agreed to. We say negotiated. I understand that's contested. He then emails that spreadsheet to the assessor, directs the assessor how to author the letter to Mr. Love to essentially make it clear that the city is interested in this project. The assessor then sends that letter with the spreadsheet to Mr. Loves. There is no changes made. And then Mr. Bowen emails the Loves company and officials there and says essentially we went in with these projections and we came to an agreement that we would have a 19% to 81% property classification split, and we excised $90 million from the valuation of the project, and Loves was very excited about it. It was then also later on after the negotiation between Loves and Harvest, it was included in the fee schedule that Loves emailed to Harvest on February 12th. It wasn't taken out of that, and Harvest turned around and said we agree to this fee. There were disagreements kind of on some things at the margin, but Harvest was willing to accept $7.3 million, which included those property tax reductions. So I just want to kind of circle back and reiterate, too, there is simply nothing in the record that shows that anything that occurred with the assessor would have occurred outside Harvest's work with Loves. There is no evidence in the record that shows that Loves would have gone to the assessor on its own. This was Harvest's strategy. Harvest brought it to them. Ultimately, the taxes would have been calculated. Well, I'm not sure about that, Judge Phillips. I think that's essentially what I'm saying. The record shows that Loves would have submitted its internal projections, which were far less favorable. They would have been paid on that. They may have challenged down the road, which is, according to the record, the normal course for corporations. Let me give you what I think is a more natural reading of property tax reduction, which is the assessor says here's how much it is, X million, and in goes Harvest and says we checked all your math. It looks right. Our lawyers tell us that you've applied the Nebraska law correctly. But if you want this truck stopped, you're going to have to make us a deal. It's going to be 300 jobs and all of this tax revenue for your county. Cut it in half and you've got a deal. And the county commissioners bite their fingernails and come back and sign the paper. That sounds like an incentive for a property tax reduction. Sure. That's not what happened. Well, I would submit, actually, that the record evidence suggests there was a negotiation. Mr. Bowen certainly says it was negotiated. And Mr. Bowen and Mr. Price certainly testified of the fact that there was great leverage, there was uncertainty about Loves moving forward, and there was great interest from the city of Hastings to get this project there. I'd also note just gaps in the assessor's declaration because, you know, she sort of opines on her application of the law. We've never contested that, you know, she was applying Nebraska law. And we've never contested that there was something nefarious going on here. But what she doesn't deny or say, she doesn't deny she has discretion. She doesn't say that there's no discretion or ambiguity under Nebraska property law. She doesn't say that Harvest had no impact on the assessment. She doesn't say the assessment she reached was a foregone conclusion. She doesn't deny Harvest drafted the spreadsheet she adopted. And she doesn't deny Harvest reviewed and approved her letter to Loves. I'd like to reserve my nine seconds. That's it. Thank you, judges. May it please the court. Peter Waddy and Allison Stewart on behalf of Loves Travel Stops and Country Stores, Inc., as well as Muscat Corporation with us today. This is Corporate Representative Morris Colley from Loves. I wanted to start, Your Honor, very briefly with the claim that Mr. Bowen's declaration, which I'm sure the panel has studied already with great care, it was represented as him opining or declaring, swearing that he negotiated with the tax assessor, Ms. Jackie Russell. He doesn't say he negotiated in his declaration. There's no mention of him negotiating or educating the tax assessor on how to apply Directive 11, how to apply Nebraska law, how to get the jobs. Judge Phelps, the sequence that you articulated, that's the sequence where maybe a property tax reduction would have been triggered as an incentive causing a fee to be paid. But the fact and the scenario and the sequence Your Honor articulated, that's not what happened here. There was one property tax classification. There was never a reduction. And there was never an abatement. And as Judge Cothran found in her examination of the record, all of the evidence can be very easily harmonized. Because you take the declaration of Mr. Bowen and you take the declaration of the county tax assessor, Ms. Jackie Russell, and it's crystal clear. He met with her, with other officials. He sat in a meeting. There was a process of her doing an analysis. He never says that he interpreted Nebraska law for her. He can't. He's not a Nebraska lawyer. This isn't the engaging the unauthorized practice of law. He's a guy from Tennessee who does this kind of incentive consulting. He's going to then go to Hastings and then educate the county assessor on how she should apply the directives she's been applying for all of these years. Let me ask you. Yes, Your Honor. What happened at that meeting was what was expected. It's what Harvest expected to do and what Loves expected Harvest to do. Is that right? No, Your Honor. Harvest, I give them an A plus for marketing, candidly. And this is what counsel is referring to. There was a claim that there's a lot of tax liability. And that tax liability was estimated. Estimated. There was never actual tax liability. Loves had a pro forma estimating. Like you'd say, I think my house probably went up 10% in value. The tax liability might be X. They walked out of that meeting with a $90 million valuation reduction, right? Not because of Harvest. Because the county assessor said your analysis is all wet. Isn't that a disputed material fact? Absolutely not. Harvest doesn't claim that they negotiated or educated her. And, in fact, there was never a property tax classification ever except for the one time when she classified it. And that classification was never reduced and never abated. If it was, that would be an incentive as defined in the agreement. And that never happened. I have two questions related to that. One is my first question, which you didn't respond to yet. I think you're invited to get into it. But what was my first question? In the meeting. No, with respect to the evaluation. The position of Harvest is that Loves had reached a figure that it took to be the property tax evaluation. The evaluation for property tax purposes and the amount of taxes they expected to pay. And in accordance with standard practice of Loves, Loves would have paid that tax for a period of a few years. And then maybe then looked into whether it could be reduced. At some point, I think it was like 10 years later. Is there any evidence to support that view of the evidence? That view of what happened? What the evidence is, Your Honor, is the pro forma that Your Honor is referring to that would have been the basis of an erroneous tax calculation. It was prepared by Loves as an estimate. It went to the county assessor at 1303 in the record. She saw that. She said, to summarize, this is backwards. There should be way more personal property here. The tax assessor said that? As soon as she saw this, because they're sitting in Oklahoma City. They don't know about Directive 11. And this was without any involvement of Harvest? Harvest had done nothing to cause the county assessor to wave her hands and be like, you guys are doing it all wrong. They don't know anything about it. So Loves sent its estimate of what it would have to pay and why. Sent it to the county assessor. And the county assessor, without having had any communication with Harvest, said, this is all wrong. You should have it much lower. Almost. It sent it prepared by Loves. Sent it to Harvest. Harvest forwarded it on. What Loves had prepared to the county assessor. Harvest forwarded it on without any comment or anything? They didn't do anything to it. And they blamed Loves on this. Oh, it was inflated. And it goes to the county assessor. Yes, Your Honor. At 13.03 in the record, she said, I'm really finding it hard to believe that there's not more personal property. Why is that? Because when they prepared it in Oklahoma City, they don't know about the distinction between trade fixture and fixture as applied in Hastings, Nebraska, pursuant to the county assessor and Directive 11-5. So they just kind of put it together, you know, based on their layman's understanding. And when she received it, she then looked at it and said, there should be more personal property tax. There should be more personal property. Why was it sent to the assessor? So that she could kind of get a sense of the schedule as it was being estimated. And then, so she then sent back to Loves and Harvest an example. Hey, we had an ethanol plant. It's kind of similar to what you guys are wanting to do. This is how it should be done. Hello? And then what she ultimately did was allocate the property in a manner very consistent with respect to the ratios 80-20, and reversing it in the Loves project as she had with the ethanol project, because she has an understanding of the trade fixtures. So there was a meeting that Harvest was going to have with the county assessor. And that was endorsed by Loves. Yes, Loves knew about the meeting and welcomed the meeting happening. What was the understanding regarding what would happen at that meeting? What was the meeting for? To review with the county assessor the project as it was contemplated at that time, based on the pro forma or schedule that Loves had prepared. At the meeting, after she had sent to them an example of how to fix this schedule, they sat down at the meeting, and this is totally consistent with their declaration. She went through and she did her own analysis and corrected. Loves wasn't expecting any negotiation at that. Well, there was no negotiation needed. She was educated enough. So Loves expected Harvest to do this without any remuneration? Well, they were paid $3.9 million for the other incentives that they got. Yes, but they weren't going to be compensated at all for anything good that happened out of that meeting. Well, Your Honor, if they had done something akin to what Judge Phillips had articulated, then that would have been a property tax reduction. Yes, but you weren't anticipating anything. And you say, go ahead and do this. It's a freebie. We encourage you to do this. Was that the understanding of Loves? That was the result. Well, why didn't you have Harvest do this when it wasn't under its contract? The contract was to negotiate incentives, in your view. Why did they ask Harvest to do this and then express great pleasure with Harvest doing that? What was their thinking then? Well, the great pleasure was expressed because they were under the misapprehension that their inflated categories was correct. They weren't pleased with Harvest. They were pleased with the tax assessor. Well, Harvest came back and said, we had a great victory today. We really did a great thing for you all. But that wasn't really true. All that happened was the county assessor said, what you guys are doing here. And when did Loves first realize that Harvest hadn't done anything and shouldn't be compensated? Well, they got an invoice from Harvest and they said, you need to pay us. There's disputes about whether the amount is owed and when it's owed. And so when they began evaluating what actually had happened, then they realized that that's not all that they ever got was a property tax classification, which is not an incentive. There was one property tax classification. There was never a property tax reduction. There was never a property tax abatement. So they didn't owe any money because they never got an incentive out of the plain language of the contract. Let me address another word that appears in the contract besides incentive. And that's benefit. And the pay is based on the incentive slash benefits approved for pursuit by Loves. That's in the fee arrangement section. Harvest fee shall be comprised of the following, colon, one, no star I guess that is. Negotiation fee of 10% of the monthly agreed upon anticipated utilization of incentives slash benefits approved for pursuit. What is the benefit? What's the meaning of the word benefit? If there's some other incentive that they negotiate and secure. For example, pursuit of the Nebraska Advantage Act. It's a statutory scheme and that was a benefit that they secured. Generally, when we interpret documents, we try to give meaning to every word. Yes, Your Honor. What did the word benefits add? If it only means what you said, which is another word for incentives. It's not another word for incentives. So what does it add in your view? It adds other benefits, other enticements to come to the facility. That's the definition of incentives and enticement. What does benefits add? I don't think that's clear. Both of you argued this is typical in our court. Both sides argue that the contract is unambiguous, but they totally disagree on what it means. So what's the word benefits mean? Isn't it ambiguous here? What is not ambiguous is property tax is clearly called out. So it's not under benefits, but it's clearly called out in another section. So we need to go looking for other sections to find out if that's a benefit because property tax reductions and abatements are clearly delineated in the agreement. Where's that in the contract? That's right there. If you're on the first page of the agreement, it's 425 in the record. If you see the first, second, third paragraph that starts with incentives come in the form, do you see that language? Yes, cash grants, land grants. If you continue reading on the second line, you'll see property tax reductions or abatements. Property tax reductions. So that's where you think in terms of what happened with respect to the property taxation issue here. How does that show that a reduction of property taxes that's not an incentive is not a benefit? How does that language eliminate that possibility? Where does that language exclude reductions in property tax? Because property tax, the treatment of property tax, and how you would get paid around property tax work is clearly called out. It would be a reduction or it would be an abatement. There's no other thing related. Those are incentives come in this form. It doesn't say what form benefits come in. It doesn't say benefits do not include tax reductions. But because property tax classification, property tax reductions, property tax abatements, the treatment of property tax, because that's specifically called out in the incentive paragraph, then we don't need to flip over to benefits and say, well, maybe it's there because it's not. It's actually literally black and white under incentives. Why can't it be both places? Why can't it also be a benefit? There's some incentives. Sometimes you get property tax reductions through incentives. Sometimes you get it as a benefit to just good, hard, old-fashioned factual work and legal research and presentation. Why was that work not to be compensated as a benefit? Because they didn't secure anything other than the tax assessor applying Nebraska law and simply doing her job. The fact that they met with her to observe her entering the appropriate classifications and correcting their work under the trade fixture application analysis, that's not, they didn't secure, Harvest did not secure a benefit for Loves. Yes, the Nebraska legislature did. Yes, Ms. Jackie Russell, the tax assessor did. So when you win this case, you can't claim to have made any benefit to your client. You're not compensated for any benefit to the client because all we did was decide the law, and you didn't have anything to do with that? You didn't benefit your client? Well, your interpretation and your application of the law, you're not. That's separate than a jury. That's not the jury. You're not sitting as, that's in a jury's role. So we're not going to impanel a jury to hear from Ms. Russell and to understand, well, Ms. Russell, what did, did Mr. Bowen educate you on? Yeah, why not? Well, go ahead. What was the understanding between the parties as far as Loves' estimate? Was that something that the parties understood the incentive was going to be based off of? How did it even, is this what Loves does every time is estimate, give a bogus, mistaken estimate of its taxes, and then hope that the county assessor comes through? Wait, you know, it's not, it wasn't intended to be a bogus estimate. Well, that's the wrong word. Inaccurate, unthought. There's a nuanced provision under Directive 11 in the Nebraska statutory framework that Loves did not know about, and Harvest didn't know about it. That's why there's no mention of trade fixture in any of the Harvest materials in the record going back and forth to Love prior to the county assessor saying, hey, this is how it works. What if Loves had done a good job and hired a Nebraska counsel and so forth and talked to the county assessor and come up with the number that the county assessor ultimately came up with and then said to Harvest, here's the number, go see if you can do better. And Harvest said, we can't do better. We're not going to waste our time. Then no fee would have been earned by Harvest. So Harvest really does incur loss of time at the very least. Not necessarily, Your Honor. If they can secure a reduction on what the assessor's classification is, then they would be paid for this. Was that ever sought? Is that part of this record? No, they have not. There's only been, it's undisputed, there's only been one classification, and there's never, by any party, been sought a reclassification of that one classification. I'm out of time. Just to finish, we're trying to understand what happened in this meeting, and really we have a bunch of contested affidavits. The district court went with the tax assessor's affidavit and have basically one sentence on what she said happened in that room. Why isn't there at least some contested facts about what the conversations were and what effect they had on the tax assessor? Your Honor, there actually aren't contested declarations. If you were to read Wes Bowen's, the other declaration before the court is from somebody who wasn't in the meeting, Sam Kreitz. Mr. Bowen was in that meeting, and you'll see that you can harmonize his declaration with the assessor's declaration, and he makes no claim to have educated her, to have negotiated with her, to have done anything. At most, he generically says, as a result of these efforts, the classification, the evaluation was reduced. But as a result of whose efforts? As a result of her efforts. Not their efforts. And so for that reason, Your Honor, it's not really a scenario where you've got two competing declarations, and Judge Kaufman goes, well, I like the assessor more. She's more credible. It's a situation where you can take those two declarations, and you can harmonize them with relative ease. Thank you, Your Honor. Thank you for your indulgence, Your Honor. Let me just actually read a few passages from Mr. Bowen's declarations. Among other places, 635 and 636, paragraphs 21 through 23. Among other things that Mr. Bowen says, they discuss the importance of the project to the local community, and the issue of Love's perception that the property tax estimates were too high. They review the construction budget. Both Harvest and the assessor work to exclude as many costs as possible from evaluation and segregate as many of the assets as possible into personal property from real by utilizing the assessor's inherent latitude in the broad statutory definitions of real property, personal property, and trade fixtures. He goes on to recount how he kept a contemporaneous spreadsheet, went line item by line item explaining. The record and the declaration speak for itself. I don't agree with the mischaracterization of the evidence. It's undisputed on this record that Love's estimated its tax liability as being higher. It's undisputed on this record that it would have paid its taxes based on that higher estimation, but for Harvest's engagement with them, but for Harvest's novel strategy to lower the taxes, Love's directed them to take this meeting with the express purpose of lowering the tax burden. What about this email from the assessor? I believe it's page 1304 in the record. First of all, on that email, there's no indication that there was an exchange. Actually, the pro forma, but even if there was, to your kind of question, Judge Hartz, it was Harvest sort of negotiated this entire meeting between the assessor and itself on behalf of its client, Love's. So this wasn't something where, you know, Love's just sort of forwarded it, and we forwarded it, and weren't engaged. We took the initiative of this. This was our strategy. We brought to Love's. We said, we can have a meeting on the front end. You're going to reap years of time value of money, among other things, because normally you would challenge this 10 years down the road and hire a specialized firm to do it. So you're not going to incur those costs. You're going to have not only certainty in your classifications and valuation, but they're going to be lower. And you're then going to have all that money that you would have spent for 10 years, you're going to have it back. And just to close, if I might. What did the assessor say? The characterization by opposing counsel was that the assessor just gets this document from Love's and says, wow, you really goofed. You've calculated a much higher tax. You're putting a lot of stuff in real property that should be personal property. Is that correct? So the assessor says in that e-mail that the quote is something like, I'm finding it really hard to believe. And as I read it, and I don't believe this is contested, she's commenting in relation to prior projects that she reviewed. So they had sort of said this is going to be a renewable diesel project, which was unique. She says, I'm finding it hard to believe there's not going to be a lot of personal property in this. And then she says something like, without seeing a lot of blueprints or something or other, I find it hard to kind of come to a conclusion. Now what later comes of that that the record shows is Mr. Bowen goes in there, they have this discussion, they work with this pro forma. Mr. Bowen is an active participant in this. He describes his actions in this declaration. And the assessor's e-mail was not as a result of anything that Harvest had done up to that point. Harvest, well, I'm not sure I entirely agree with that. Harvest had engaged with her. I think she is following up on a phone conversation. That's how the e-mail opens. They had had a phone conversation with the assessor. And there's sort of a series of e-mails in the beginning or mid-September where Harvest is kind of asking, I would like to set up this meeting. We would like to set up this meeting with you. We'd like to discuss these. Fifteen seconds if you have something else to say. Okay. I just want to say no one is characterizing these kind of estimates by loves as bogus. What I think the fact that the estimates by loves are so different than the eventual assessment speaks to the fact that there's some ambiguity and inherent discretion and inherent uncertainty in the broad definitions of property under Nebraska law. Okay. Thank you. Thank you, Counselor. Case is submitted. Thank you. Good arguments. Counselor excused. And now we'll take our recess. I think we need ten minutes at this point. Court is in recess for ten minutes.